**SO ORDERED.**

**SIGNED this 16 day of April, 2009.**

_____
**J. Rich Leonard
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

IN RE:

MALCOLM MCFALL BABB,

      Debtor.                                Case No. 06-03003-8-JRL
                                                  Chapter 7

_____

### **ORDER**

This matter came before the court on the Chapter 7 Trustee's motion for approval of compromise with Mitchell McFall Babb. The court conducted a hearing in Wilmington, North Carolina on February 18 and March 17, 2009. This order confirms and provides the rationale for the oral ruling at the conclusion of the hearing allowing the motion.

### **BACKGROUND/PROCEDURAL HISTORY**

The compromise proposed by the Trustee arises from a dispute in ownership of two separate pieces of real property located in North and South Carolina. On August 2, 1973, the Kingston Corporation conveyed by quitclaim deed a one-half undivided interest in approximately 10.3 acres of land in Charlotte, North Carolina (the "Charlotte Property") to "M. McFall Babb." The deed was recorded in Book 3609, page 157 of the Mecklenburg County Register of Deeds.

On August 28, 1987, Cedar Creek Village, Inc., a South Carolina corporation, deeded real property located in Little River Township and described as Lot Nine, Block "C" of Cedar Creek Village (the "Little River Property") to "M. McFall Babb." The deed was recorded in the Horry County Register of Deeds, Book 1170, Page 282.

The debtor filed for relief under Chapter 13 of the Bankruptcy Code on September 22, 2006 and his case was converted to Chapter 7 on February 26, 2007. On September 11, 2007, the Trustee filed a motion for authority to list and sell properties and for determination of ownership (the "Motion for Sale"). The Trustee sought through its Motion for Sale authority to sell the Charlotte and Little River Properties and a determination that these properties were owned by the debtor and constituted property of the estate. The debtor, whose full name is Malcolm McFall Babb, denies that he is the grantee and owner of the Charlotte and Little River Properties. Instead, the debtor alleges that the properties belong to his son, Mitchell McFall Babb ("Mitchell").

On August 21, 2007, the court concluded at a hearing that Mitchell was incompetent to testify before the court. Mitchell is permanently disabled as the result of a stroke suffered in 1994. As a result, and pursuant to an order entered on October 22, 2007, the court appointed Stephani W. Humrickhouse as the guardian ad litem "for the protection of Mitchell's financial interest and to discern the truth regarding property ownership." In response to a motion filed by the guardian ad litem, the court entered an order on March 20, 2008, authorizing her to engage in settlement negotiations with the Trustee concerning the ownership of the Charlotte and Little River Properties. The Trustee and guardian ad litem were successful in reaching a compromise and on July 16, 2008, the Trustee filed a motion to approve compromise with Mitchell.

**DISCUSSION**

Under § 363 of the Bankruptcy Code, after notice and a hearing, the trustee may "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Federal Rules of Bankruptcy Procedure provide that "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." FED R. BANKR. P. 9019(a). The court may approve a compromise if it is "fair and equitable" and in the best interests of the estate. U.S. ex rel. Rahman v. Oncology Assoc., P.C., 269 B.R. 139, 150 (D. Md. 2001) (citing In re Flight Transp. Corp. Sec. Litig., 730 F.2d 1128, 1135 (8th Cir.), cert. den., 469 U.S. 1207 (1985)); see also St. Paul Fire & Marine Ins. Co. v. Vaughn, 779 F.2d 1003, 1010 (4th Cir. 1985) (a debtor's objection to approval of compromise is not fatal if "it is found to be in the best interests of the estate as a whole."). The Supreme Court has provided several guidelines for bankruptcy courts to consider before approving a compromise. Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) ("TMT")). As the Supreme Court explained in TMT, the bankruptcy court should

> apprise [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

TMT, 390 U.S. at 424.

With regard to the role of a guardian ad litem, other circuit courts have concluded that,

although a guardian ad litem may negotiate a proposed compromise to be referred to the court, the effectiveness of the compromise is subject to the court's order approving the settlement. <u>Dacanay v. Mendoza</u>, 573 F.2d 1075, 1079-80 (9th Cir. 1978) ("[T]he binding characteristic of the settlement derives from the approval of the court and not from the consent of the guardian ad litem, who is but an officer of the court."); <u>Noe v. True</u>, 507 F.2d 9, 12 (6th Cir. 1974) ("[T]hrough a guardian ad litem the court itself assumes ultimate responsibility for determinations made on behalf of the [ward]. . . ").  Similarly, North Carolina courts have ruled that a guardian ad litem cannot consent to a judgment or compromise without the investigation and approval by the court. <u>Ballard v. Hunter</u>, 12 N.C. App. 613, 619, 184 S.E.2d 423, 427 (1971) ("A judgment or compromise settlement negotiated by a next friend or guardian without the investigation and approval of the court is invalid."); <u>State ex rel. Hagins v. Phipps</u>, 1 N.C. App. 63, 159 S.E.2d 601, 603 (1968); <u>Butler v. Winston</u>, 223 N.C. 421, 425, 27 S.E.2d 124, 126 (1943).

After carefully considering the evidence on record, the court concludes that the debtor is unlikely to succeed in litigation concerning the ownership of the Charlotte and Little River Properties, and that the proposed compromise is fair and equitable and in the best interests of the estate and Mitchell.

<u>The Charlotte Property</u>

The Trustee contends that the Charlotte Property is property of the estate which may be sold and the proceeds of which may be distributed to unsecured creditors.  The Charlotte Property was conveyed by quitclaim deed, dated August 2, 1973, to "M. McFall Babb."  At hearing, the Trustee introduced multiple documents supporting his position that the grantee is the debtor and not his son.

First, the Trustee introduced two checks for the payment of property taxes on the Charlotte

4

Property. The first check, dated November 20, 1987, was in the name of M. McFall Babb and signed by the debtor. Enclosed with the check was a letter signed by the debtor indicating that the check represented payment "for my ½ 1987 property tax on the Milton Rd/CLT investment." The second check, dated December 31, 1993, was drawn from the account of Brenda Babb. A letter accompanying this check was also signed by the debtor and provided that the payment represented "my share" of property taxes for the Charlotte Property. The Trustee asserts that these letters establish that the debtor held an ownership interest in the Charlotte Property. In response, the debtor argued that the property belonged to Mitchell and alleged that he wrote the letters on behalf of Mitchell as Mitchell's attorney-in-fact. However, the debtor was unable to produce any evidence of a power of attorney to act on behalf of Mitchell during that period of time. In addition, the debtor failed to adequately explain why he did not sign the letters as Mitchell's attorney-in-fact. On cross-examination, the debtor stated that he could not remember holding a power of attorney prior to 2004.

Second, the Trustee introduced copies of pleadings filed in three cases involving the Charlotte Property, each of which was before the Mecklenburg County Superior Court.[1] In each of these pleadings, the debtor admitted to owning a one-half undivided interest in the Charlotte Property. In response, the debtor again alleged that his actions related to the Charlotte Property were performed on behalf of Mitchell as Mitchell's attorney-in-fact. However, the named defendants in two of the cases consisted of "M. McFall Babb *and wife,* Brenda Babb" (emphasis

---

[1]Answer and Third Party Complaint, Susan S. Purser and Cynthia S. Hattersley v. M. McFall Babb, Case No. 88-CVS-2332 (Aug. 5, 1988); Answer, Counterclaim and Cross-Claim of the Defendants, The City of Charlotte v. M. McFall Babb and wife, Brenda Babb, et al., Case No. 95-CVS-11662 (July 29, 1996); Answer, Counterclaim and Cross-Claim of Defendants, City of Charlotte and Mecklenburg County v. M. McFall Babb and wife, Brenda Babb, et al., Case No. 04-CvD-15103 (Sept. 27, 2004).

added). Significantly, the debtor admitted at hearing that he did not contend in proceedings before the Superior Court that Mitchell was the owner of the Charlotte Property.

Third, the Trustee introduced the debtor's personal financial statement, which the debtor signed and provided to First Atlantic Bank on December 2, 1991. In his financial statement, the debtor represented that he held a 50% ownership interest in the Charlotte Property. At hearing, the debtor argued that his financial statement was void because it was never notarized.

Fourth, the Trustee introduced several statements of disclosure in which Mitchell indicated that he did not own any real property. Among the statements requiring the disclosure of assets were three applications for Medicaid filed between 2004 and 2006. In addition, Mitchell filed a sworn declaration of assets with the Horry County Family Court on August 8, 1997. In both the Medicaid applications and the sworn declaration of assets, Mitchell stated that he owned no real property. In response, the debtor argued that the Medicaid applications were submitted without the debtor's knowledge and that Mitchell no longer qualified to receive Medicaid because he owned real property.

In support of the debtor's position that the Charlotte Property belongs to Mitchell, the debtor relied on evidence that Mitchell's uncle provided money to the children of the debtor. Specifically, the debtor asserted at hearing that Mitchell received funds from his uncle, David Hutto, as the result of a trust created by Mitchell's grandmother, Winnifred L. Hutto. At hearing, the debtor introduced a copy of the Last Will and Testament of Winnifred L. Hutto. According to her will, which was neither signed nor dated, Ms. Hutto intended to devise a one-half share in her residual estate to David Hutto, as trustee, for the benefit of her daughter, Winnifred Babb. Ms. Hutto's will further provided that upon the death of Winnifred Babb, the trustee was required to divide the trust estate into equal parts for the benefit of her children. However, the debtor admitted

at hearing that Ms. Hutto's will became invalid when she remarried. Subsequently, on July 14, 1969, Ms. Hutto died intestate and her son, David Hutto, was appointed as the administrator of her personal estate. After Ms. Hutto's death, the South Carolina probate court issued an Administration Bond for her estate in the amount of $193,714.00.

In addition, the debtor established that Winnifred Babb attempted to create a trust for the benefit of the debtor's children.[2] On October 15, 1971, approximately two years after the death of her mother, Winnifred Babb died in a car accident and was survived by the debtor and their three children, Mitchell, David, and Susanne (collectively, the "Babb Children"). At hearing, the debtor introduced a copy of a trust agreement executed by Winnifred Babb and David Hutto. The purpose of the trust agreement was to create a revocable trust in the name of Winnifred H. Babb to be managed by David Hutto as the trustee. Under the terms of the trust agreement, the trustee was responsible for managing the trust's assets and distributing the income of the trust in support of the Babb Children. Although the trust agreement was unsigned, the debtor provided Schedule K-1 tax documents from 1973 and 1974 in which the Babb Children reported income from a trust entitled the "Winnifred H. Babb Trust." These tax documents listed taxable income generated by the trust in the amounts of $40.84 in 1973 and $55.39 in 1974.

In further support of the debtor's position, David Babb testified that he believed a trust existed from which David Hutto paid certain expenses of the Babb Children. David Babb explained that, with respect to money, his relationship with his uncle was "call as you need it." Among the expenses allegedly paid by David Hutto were David Babb's rent and attorney's fees, Susanne's tuition for college and medical school, and the cost of Susanne's trip to Europe. As for

---

[2]Winnifred Babb was the daughter of Ms. Hutto and wife of the debtor at the time of her death.

Mitchell, David Babb established that David Hutto contributed money for the payment of Mitchell's rent while Mitchell was in law school. David Babb further testified that he believed Mitchell owned the Charlotte and Little River Properties as a result of financial assistance from David Hutto.

The court acknowledges that there is some evidence that Mitchell may have had access to funds from the estates of his grandmother and mother around the time that the Charlotte Property was conveyed; however, the court finds that the documentary evidence favors the Trustee's position that the debtor is the owner of the Charlotte Property. Prior to bankruptcy, the debtor consistently represented that he was the owner of a one-half undivided interest in the Charlotte Property in signed statements accompanying property tax payments, a personal financial statement required by a bank, as well as in sworn pleadings in three cases before the Mecklenburg County Superior Court. Conversely, disclosure statements required of Mitchell in connection with his divorce and applications for Medicaid were consistent in representing that Mitchell held no interest in real property. Further, the debtor was unable to provide documentary evidence that he held a power of attorney to represent Mitchell when engaging in actions related to the Charlotte Property. In fact, the debtor admitted that in past litigation involving the Charlotte Property he never indicated that he was acting on behalf of Mitchell. Finally, there is no documentary evidence from which to conclude that sufficient funds were available to Mitchell for the purchase of real property in 1973; rather, tax documents from the same year reflected income generated from the Winnifred H. Babb Trust insufficient to fund the purchase of real property. To the extent that David Hutto may have provided Mitchell with funds outside of the trust from which to purchase the Charlotte Property, such an inference cannot overcome substantial documentary evidence supporting the Trustee's position that the Charlotte Property is property of the estate.

The Little River Property

The Trustee further contends that the Little River Property is property of the estate subject to sale. In support of this contention, the Trustee introduced a Deed to Real Estate, dated August 28, 1987, pursuant to which Cedar Creek Village, Inc. ("Cedar Creek") conveyed the Little River Property to "M. McFall Babb." In addition, the Trustee introduced an agreement between Cedar Creek and M. McFall Babb for the purchase of the Little River Property. At hearing, the debtor admitted to signing the purchase agreement but asserted that he did so as Mitchell's attorney-in-fact. However, the debtor was unable to produce documentary evidence of a power of attorney authorizing him to purchase property on behalf of Mitchell. The debtor further asserted that he was acting as the guardian of Mitchell; however, Mitchell was 25 years old and competent at the time of the transaction.

Also at hearing, the Trustee introduced mortgage documents related to the Little River Property. According to a Mortgage of Real Estate filed with the Clerk of Court for Horry County on August 9, 1985, Cedar Creek and Hubert and Lois Dameron entered into a mortgage agreement on the Little River Property in the amount of $55,000.00. Subsequently, on October 16, 1987, the mortgage was assigned to M. McFall Babb pursuant to a Transfer of Mortgage. The Transfer of Mortgage was signed by Hubert and Lois Dameron and notarized. The Trustee also introduced a copy of an instrument purporting to assign the mortgage "to Mac Babb this 9th day of October, 1987." However, the debtor claimed that he had never seen the Transfer of Mortgage. In addition, the Trustee introduced Cedar Creek's closing statement for the sale of the Little River Property. Cedar Creek's closing statement listed the purchase price of the Little River Property at $107,500.00 and the payoff of a mortgage on the property in the amount of $52,325.86. The Trustee introduced a copy of a check in the amount of $52,325.86 drawn from the debtor's account

9

and signed by the debtor. Based on these mortgage documents and the debtor's check, the Trustee contends that the debtor purchased the Little River Property and paid off the mortgage.

Additionally, the Trustee introduced a 1099 tax statement listing the names and addresses of the parties involved in the sale of the Little River Property. The 1099 statement identified the purchaser as "M. McFall Babb" and contained the social security number of the debtor. In response, the debtor asserted that the 1099 tax statement failed to establish that he was the purchaser because the social security number was hand-written whereas the rest of the statement was typed. In his deposition, George W. Cox, the attorney who represented Cedar Creek at closing, could not explain why the debtor's social security number was written by hand or who had written it.

Other documentary evidence in support of the Trustee's position included the debtor's personal financial statement and Mitchell's divorce records. On December 2, 1991, the debtor submitted a personal financial statement to First Atlantic Bank in connection with an application for a loan. His signed financial statement indicated that he was the owner and title holder of the Little River Property. Consistent with this assertion is the sworn financial declaration of Mitchell, filed with the Horry County Clerk of Court on August 8, 1997. Mitchell filed his financial declaration for the purpose of disclosing all of his assets at the time of his divorce from his ex-wife. Among the assets he disclosed were a checking account in the amount of $700.00 and cash on hand in the amount of $15.00. However, Mitchell's financial declaration did not provide for any interest in real property.

At hearing, the debtor introduced affidavits of Mitchell and Brenda Babb taken in 2004 in a

case before the South Carolina Administrative Law Court.[3] The case concerned the eligibility of the Little River Property for a special assessment ratio for the 2003 tax year. In order to qualify for the special assessment, the debtor was required to show that Mitchell was the owner of the Little River Property. Although Mitchell and Brenda Babb indicated in their sworn affidavits that Mitchell was the sole owner of the Little River Property, the Administrative Law Court found no independent or documentary evidence supporting the assertion that Mitchell had the means to purchase the Little River Property or construct a home on it. M. McFall Babb v. Horry County Assessor, Docket No. 04-ALJ-17-0130-CC at 6 (Jan. 13, 2005). As a result, the Administrative Law Court found that the debtor, as the next friend of Mitchell, failed to prove by a preponderance of the evidence that Mitchell was the owner of the property. Id. at 7.

The Trustee further asserts that there is no evidence that Mitchell was known within the Babb family as "M. McFall Babb." David Babb testified on behalf of the debtor and established that three members of his family carried the middle name "McFall," including Mitchell. However, David Babb established that his family did not typically refer to Mitchell as "McFall." When asked why the Charlotte and Little River Properties were conveyed to "M. McFall Babb" if Mitchell was intended to be the grantee, David Babb stated that he did not know. In fact, the debtor has never satisfactorily answered the court's persistent question as to why both properties were titled in the name of "M. McFall Babb," a name not otherwise used by either father or son, if not to intentionally create an ambiguity as to ownership.

Despite substantial evidence to the contrary, the debtor contends that Mitchell owns the Little River Property. First, the debtor introduced a copy of an application for a special assessment

---

[3]M. McFall Babb v. Horry County Assessor, Docket No. 04-ALJ-17-0130-CC (Jan. 13, 2005).

ratio filed in 1990 with the Horry County Assessors Office. The application named M. McFall Babb as the owner of the property and included Mitchell's signature. Second, the debtor introduced copies of two checks made out to the county treasurer on December 2, 1991 and December 22, 1992. The checks represented payments for property taxes on the Little River Property in the amounts of $1,619.76 and $1,665.24, respectively. The checks were signed by Mitchell but did not reference the name or address on the account. Third, the debtor introduced copies of Mitchell's medicare and identification cards, as well as records from the Veteran Affairs Medical Center in Fayetteville, North Carolina, each of which listed the Little River Property as Mitchell's home address. Fourth, the debtor introduced a contact sheet produced by Mitchell's caseworker at the Department of Social Services. The caseworker noted on the sheet that Mitchell told her that he owned real property.

      The court finds that the record supports the Trustee's position that the debtor is and always has been the owner of the Little River Property. The debtor signed the purchase agreement and paid off the mortgage on the Little River Property. The address on the debtor's bank account matched the address belonging to the transferee and grantee on the Transfer of Mortgage, Deed to Real Estate, and seller's closing statement. The debtor admitted to owning the Little River Property in a personal financial statement filed with a bank. Similar disclosure statements of Mitchell's, such as his financial declaration filed with the Family Court of Horry County at the time of his divorce, indicated that Mitchell held no ownership interest in real property. In addition, the South Carolina Administrative Law Court confronted the issue of ownership of the Little River Property and concluded that the debtor failed to prove by a preponderance of the evidence that Mitchell was the owner.

      The court recognizes that there is some evidence supporting the debtor's assertion that

Mitchell is the owner of the Little River Property. For example, the Little River Property is listed as Mitchell's address on his identification and medicare cards, as well as the records of the Veterans Affairs Medical Center in Fayetteville, North Carolina. In addition, Mitchell filed an application for a special assessment of the Little River Property, and there is evidence that he paid property taxes for the years 1991 and 1992. Although the court finds that it is unlikely that Mitchell is the owner of the Little River Property, evidence in favor of Mitchell's ownership corroborates the court's view that a compromise is in the best interests of the estate.

## CONCLUSION

When a case comes into Chapter 7, the Trustee obtains custody and control over all property of the estate. Therefore, it is in the Trustee's discretion whether to litigate title, abandon property, or to compromise disputed claims. In this case, the Trustee reached a compromise regarding the ownership of the Charlotte and Little River Properties with the court-appointed guardian ad litem for Mitchell. The guardian ad litem established at hearing that she conducted a thorough investigation of the ownership of the Charlotte and Little River Properties. Following her investigation, the guardian ad litem concluded that she could not prove, based on the evidence available, that Mitchell owned either property. Instead, the guardian ad litem testified that there was substantial evidence that the debtor owned the property. Additionally, the guardian ad litem estimated that the cost of going forward with litigation regarding the ownership of the Charlotte and Little River Properties would be between $10,000.00 and $15,000.00. As a result, the guardian ad litem testified that the compromise proposed by the Trustee was in Mitchell's best interest. This court agrees.

The terms of the compromise may be summarized as follows: the Trustee is permitted to sell the Charlotte Property and apply the proceeds thereof, combined with proceeds of property of

the debtor located in Oconee County, South Carolina, to the payment of allowed claims in the debtor's case. If these proceeds are insufficient to pay all allowed claims in full, the Trustee has the right to sell the Little River Property. However, the Trustee will provide the debtor and Brenda Babb with an opportunity to prevent a sale of the Little River Property upon payment of the full amount of the deficiency. In the event that there are excess proceeds of sale or the Charlotte or Little River Properties remain unsold, the Trustee will deliver such proceeds and quitclaim such property to "Mitchell McFall Babb."

The court finds that the proposed compromise is commensurate with the evidence on record. The compromise provides for the payment of allowed claims in the debtor's case through proceeds from the sale of the Charlotte and Little River Properties. In addition, the compromise provides for the transfer to Mitchell of any proceeds and property remaining after the payment of allowed claims. Therefore, the court concludes that the proposed compromise represents a fair and equitable resolution to the dispute over ownership of the Charlotte and Little River Properties, and its approval is in the best interests of the estate and Mitchell.

Based on the forgoing, the Trustee's motion for approval of compromise is ALLOWED.

**"END OF DOCUMENT"**